# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **VICTOR SANTORE, *et al.*,** ) | **No. 17 CV 5742** |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Magistrate Judge Young B. Kim** |
| ) | |
| **NARAYANAN SWAMINATHAN,** ) | |
| ) | **March 1, 2018** |
| **Defendant.** ) | |

## MEMORANDUM OPINION and ORDER

Plaintiffs Victor Santore, Alexis Humphreys, Mariela Humphreys, Mirza Abbas Raza, Vinay Kadam Sadashiv, Banmeet Saluja, Harish Singh, and Manjit Singh bring this action against Defendant Narayanan Swaminathan alleging that he violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Before the court is Swaminathan's motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(3), or in the alternative, to transfer the matter to the District of Maryland. For the following reasons, the motion is denied:

## Background

For purposes of the current motion, the court accepts as true the following well-pled facts taken from the complaint, drawing all reasonable inferences in Plaintiffs' favor. *See Berger v. Nat'l Coll. Athletic Assoc.*, 843 F.3d 285, 289-90 (7th Cir. 2016). Plaintiffs purchased an internet course on options trading from Swaminathan that began on April 3, 2016, and ended on April 29, 2016. (See R. 1,

Compl. ¶ 11.)  During the course Swaminathan promoted to Plaintiffs and others the idea of joining an investment club with him.  (Id. ¶ 12.)  A number of individuals and entities, including Plaintiffs, (collectively, the "Partners") expressed interest. (Id.)  After collecting $525 from each Partner for "legal expenses" in May 2016, Swaminathan emailed the Partners informing them that he would not be advising the club, explaining that he would have to be a registered investment advisor to do so and that registering as an advisor was "not practical" at the time.  (Id. ¶¶ 13-17.) Shortly thereafter Swaminathan emailed the Partners again directing their attention to an SEC website explaining the difference between an investment club, which operates based on members' active participation in investment decisions and is not considered a security, and an investment contract, which is considered a security because investing members expect to make a profit from the efforts of others.  (See id. ¶ 19.)

On May 24, 2016, Swaminathan formed AlphaTigers Capital, LLC ("AlphaTigers"), as an investment club organized under Delaware law.  (Id. ¶ 20.) The group consisted of 16 Partners, including the Plaintiffs, with Swaminathan as the sole operating manager.  (Id.)  A few days later, Swaminathan set up a bank account at Bank of America ("Bank Account') and an Interactive Brokers account ("IB Account"), but informed the Partners that they would not have equal access to the IB Account.  (See id. ¶¶ 21-23.)  On June 1, 2016, the Partners signed a Limited Liability Company Agreement for AlphaTigers ("Operating Agreement").  (Id. ¶ 24; R. 28-1, Ex. 1.)  Swaminathan signed the Operating Agreement on behalf of his

company, OptionTiger Trading, LLC, and on behalf of AlphaTigers as "Operating Manager." (Id. at 21-22.) Section 2.5 of the Operating Agreement states in relevant part that the purpose of AlphaTigers is "to engage in investments as an investment club, trade securities . . . , to generate profits, provide for a collaborative learning and education environment to become better traders . . . and collaborative discussion for the benefit of all Members[.]" (R. 28-1, Ex. 1.) Exhibit A of the Operating Agreement demonstrates that Plaintiffs themselves contributed a total of $625,000 in capital to AlphaTigers. (R. 1, Compl. ¶ 26; R. 28-1, Ex. 1, Ex. A.) The capital contributions of all Partners totaled $1,175,000, but Swaminathan made no capital contributions himself or on behalf of OptionTiger Trading, LLC. (Id.) According to the terms of the Operating Agreement, the Partners retained 60 percent of the equity of AlphaTigers and Swaminathan retained 40 percent of the equity. (R. 1, Compl. ¶ 27.) Net capital proceeds would first be applied to the payment of the investment club's debts and liabilities, and then the balance would be distributed to the Partners and Swaminathan in proportion to their equity interests. (Id. ¶ 28.) According to a "stop loss" provision in the Operating Agreement, if capital were to be reduced by 30 percent, AlphaTigers would dissolve with the agreement of a majority of Partners, all trading activities would cease, and only Partners who contributed capital would receive the remaining money back on a pro-rata basis. (See id. ¶¶ 30-31.) The Operating Agreement further provided that actions regarding "all matters of the Company" would need the approval of a majority of equity holders. (See R. 28-1, Ex. 1, § 5.17.)

On the day the Operating Agreement was signed, Swaminathan emailed the Partners stating that his trading would be conservative initially and that he would only use "a small fraction" of the capital. (R. 1, Compl. ¶ 32.) After transferring a total of $1,000,000 from the Bank Account to the IB Account, Swaminathan began trading through the IB Account on June 3, 2016. (Id. ¶¶ 33-35.) On June 13, 2016, Swaminathan deposited $7,500 into the Bank Account and also transferred $125,000 from the Bank Account to the IB Account. (Id. ¶¶ 36-37.) The next day, AlphaTigers transferred $70,000 from the IB Account to the Bank Account as trading profits to be distributed in accordance with Section 4.2 of the Operating Agreement. (Id. ¶ 38.) Swaminathan received $28,000 from this distribution, equal to 40 percent of the profits. (Id.)

The following day, on June 15, 2016, Swaminathan emailed the Partners to report a $90,000 net trading loss and promised to recover the amount "very quickly." (Id. ¶ 40.) A couple days later he transferred $50,000 from the Bank Account to the IB Account and emailed the Partners informing them that he had been unavailable because of a head injury and that losses had exceeded the stop loss amount. (Id. ¶¶ 41-42.) On June 19, 2016, Swaminathan emailed the Partners again and indicated that only about $180,000 remained in the IB Account. (See id. ¶ 43.) He stated that he wanted to discuss restoration of capital and offered to contribute up to $150,000 to AlphaTigers, but that he would need several weeks to make the contribution because the funds were illiquid and coming from India. (Id.)

The Partners held an emergency meeting on June 20, 2016, and agreed to freeze all trading and issue a hold on the IB Account. (Id. ¶ 44.) In the days that followed Swaminathan expressed embarrassment and his desire to "make this right," acknowledging that the size of the contracts he traded "played a big role in the losses." (Id. ¶¶ 45-48, 50.) He also promised to make efforts to repay the lost capital, although he said he could not return the $28,000 distribution he received earlier. (Id. ¶ 49.) In July and August 2016, the Partners removed Swaminathan as a signatory and account holder of the IB Account and transferred $180,000 from the IB Account to the Bank Account. (Id. ¶¶ 51-54.) Meanwhile, Swaminathan emailed the Partners, referring to his "massive fault" and offering to raise money from his assets to pay them back. (Id. ¶ 55.) But in September 2016 Swaminathan stopped communicating with the Partners citing the expectation of litigation. (Id. ¶ 56.) Plaintiffs brought this suit in August 2017.

## Analysis

Swaminathan moves to dismiss Plaintiffs' Exchange Act claim on multiple grounds. First, he seeks dismissal pursuant to Rule 12(b)(6), arguing that the parties' investment activities did not involve a security, that Plaintiffs failed to allege any material misrepresentations or omissions of fact, and that Plaintiffs have not pled the requisite scienter. Second, he seeks dismissal under Rule 9(b), which requires a party alleging fraud or mistake to state with particularity the circumstances constituting fraud or mistake. Third, he argues that the Operating Agreement requires that the dispute be submitted to arbitration. Finally,

Swaminathan contends pursuant to Rule 12(b)(3) that venue is improper in the Northern District of Illinois ("NDIL"), or alternatively, that the case should be transferred to the District of Maryland. At the court's invitation the parties filed supplemental briefing to address the Exchange Act's venue provision and the potential application of 28 U.S.C. § 1404(a), which governs change of venue. (See R. 29; R. 31, Pls.' Suppl. Resp.; R. 33, Def.'s Suppl. Mem.)

## A.      Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint, *see General Elec. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997), rather than the merits of the case. Plaintiffs' sole count alleges that Swaminathan violated Section 10(b) of the Exchange Act and Rule 10b-5. (See R. 1, Compl. ¶¶ 57-60.) In a typical Section 10(b) private action, a plaintiff must prove the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Swaminathan begins by arguing that AlphaTigers was an investment club and did not involve an "investment contract" constituting a security as alleged in the complaint. (R. 1, Compl. ¶ 58.) In the Exchange Act context, an investment contract is defined as "(1) an investment of money, (2) in a common enterprise, (3) with the expectation of profits produced solely by the efforts of others." *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984) (citing *SEC v. Howey*

*Co.*, 328 U.S. 293, 299 (1946)).  Swaminathan focuses on the third prong, contending that the formation of AlphaTigers was not a security because Plaintiffs expected to profit from their own decision-making, not from Swaminathan's efforts.  (R. 19-1, Def.'s Mem. at 5-6.)  He points to the Operating Agreement, which dictates that all investment actions must be voted on by each member.  (See id. at 5.)  According to Swaminathan, Plaintiffs were part of a "collaborative learning situation," "working collectively to make trades and invest."  (Id. at 6.)

However, Swaminathan does not address the complaint's allegations that the investment activity at issue here occurred with no votes, input, or apparent direction from Plaintiffs whatsoever.  And even though the Operating Agreement provided in theory for a collective effort, the Supreme Court has warned against relying on form over substance in determining whether a particular financial relationship constitutes an investment contract.  *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558 (1979) (noting that the definition of an investment contract should be applied in light of "the economic realities of the transaction" rather than "the names that may have been employed by the parties").  The Seventh Circuit has also eschewed a strict interpretation of the requirement that profits had to come "solely" from the efforts of others, instead endorsing "a more realistic test" examining "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Kim v. Cochenour*, 687 F.2d 210, 213 n.7 (7th Cir. 1982) (internal quotations and citations omitted).  And while the expectations

of control are generally analyzed at the time the interest is sold, courts may look at how a group actually operated and the "totality of the circumstances surrounding the offering" to determine how control was actually allocated at the outset. *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 756-57 (11th Cir. 2007) (citations omitted). Reading the well-pled facts in the complaint as true and drawing all reasonable inferences in Plaintiffs' favor, Swaminathan's efforts certainly affected AlphaTigers's success (or lack thereof) and are of central significance here. According to the complaint, despite the Operating Agreement's terms and even after sending an email in which he claimed he would not be advising the group, Swaminathan made trades unilaterally from the outset. (See R. 1, Compl. ¶¶ 22, 35-43.) He transferred funds and executed trading decisions without any input from the Partners. The Supreme Court has emphasized that "Congress did not intend to adopt a narrow restrictive concept of security in defining that term." *Tcherepnin v. Knight*, 389 U.S. 332, 338 (1967). The court therefore finds that the complaint sufficiently alleges the existence of an investment contract constituting a security.

Swaminathan next argues that Plaintiffs failed to allege that he made any material misrepresentations or omissions of fact. (R. 19-1, Def.'s Mem. at 6-7.) The court disagrees. According to the complaint, Swaminathan represented that he and the Partners would make decisions collectively, AlphaTigers would function as an investment club, he would not be "advising," he would trade conservatively to start, and that he would use only a small fraction of the capital. (See R. 1, Compl. ¶¶ 12,

16-17, 19, 32.) Plaintiffs allege that none of those statements were true because he made decisions without consulting or involving them and traded away nearly all of the Partners' capital contributions in less than three weeks. (See id. ¶¶ 35-43.) As Swaminathan himself points out, the purpose of AlphaTigers and the reason Plaintiffs joined was to collectively participate in trades and provide an educational environment for the Partners. (See R. 19-1, Def.'s Mem. at 6.) But the complaint adequately alleges that none of these goals was realized in the manner Swaminathan represented and that the formation of AlphaTigers was nothing more than bait to raise funds from unsuspecting investors.

As for scienter, the complaint in a securities-fraud action must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007) (internal quotation and citation omitted). That "state of mind" is an intent to deceive demonstrated by knowledge of a statement's falsity or reckless disregard of a substantial risk that the statement is false. *Id.* A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (internal quotations omitted) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)). The inference "need not be irrefutable . . . or even the most plausible of competing inferences[,]" but the inference of scienter must be strong in light of other explanations. *Tellabs,* 551 U.S. at 324 (internal quotations and citations omitted).

In light of the alleged facts and inferences to be drawn therefrom in favor of Plaintiffs, Swaminathan at least recklessly disregarded the truth that he intended to follow through on his representations. To properly allege fraud rather than simple breach of contract, the complaint must contain allegations demonstrating that Swaminathan never intended to perform his obligations under the Operating Agreement or to act on his email representations. *See United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) ("[W]here allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim."). Accepting the well-pled facts as true, Swaminathan was well aware of relevant restrictions imposed by federal securities laws on investment advisors. (See R. 1, Compl. ¶¶ 16-18.) It also appears he was cognizant of the difference between an investment club and an investment contract, and having taught a class on options trading before recruiting Plaintiffs to form AlphaTigers, the opposing inference that he accidentally ran afoul of the very restrictions and definitions he acknowledged in writing is not especially compelling. (See id. ¶¶ 11-12, 16-19.) Even the timeline of events strengthens the inference of scienter in that barely one month elapsed between when Swaminathan allegedly began making email statements about his role and how AlphaTigers would be run and his alleged actions directly contradicting those statements. (See id. ¶¶ 16-35.) The complaint also alleges that Swaminathan received $28,000 in trading profits despite having contributed no

capital.[1]  (Id. ¶¶ 26, 38-39); *see Tellabs,* 551 U.S. at 325 (personal financial gain may weigh heavily in favor of a scienter inference).  These alleged facts, when viewed and accepted together, are sufficient to give rise to a strong inference that Swaminathan acted with the requisite state of mind.

Lastly, Swaminathan argues that the complaint is deficient because it fails to allege a connection between the alleged misrepresentations and the transactions at issue and fails to allege the elements of reliance, economic loss, and loss causation. (R. 19-1, Def.'s Mem. at 5, 7.)  The court disagrees.  Plaintiffs sufficiently allege that they decided to invest capital and become a part of AlphaTigers in reliance on Swaminathan's representations that AlphaTigers would function as an investment club and provide an educational, interactive experience.  (See R. 1, Compl. ¶¶ 12, 16, 19, 25-26.)  The complaint also adequately alleges that Plaintiffs suffered economic loss in the form of their capital contributions as a result of their reliance. (See id. ¶¶ 40-56.)  The Supreme Court has explained that the Exchange Act should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'"  *See SEC v. Zandford*, 535 U.S. 813, 819, 822 (2002) (citation omitted) (holding it was "enough that the scheme to defraud and the sale of

---

[1]  The complaint also alleges "[u]pon information and belief" that Swaminathan wrote himself a check for an additional $5,000 at the time of the $28,000 distribution for reasons unknown.  However, invoking "information and belief" as a basis for an allegation is insufficient in a fraud case unless "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'"  *See United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1108 (7th Cir. 2014) (internal quotation and citations omitted).  Because Plaintiffs have provided no additional context regarding the alleged $5,000 check, the court does not factor that allegation into its analysis.

securities coincide[d]" where investors "were duped into believing respondent would 'conservatively invest' their assets").  The Court also recognized that "the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'"  *Id.* at 819.  Taking all well-pled facts in the complaint as true, the court finds that this is not merely a case of common-law fraud or breach of contract that happens to involve a security.  *See id.* at 823 (explaining that a valid Section 10(b) claim existed where defendant sold a security while never intending to honor the terms of the sale in the first place); *see also id.* at 820 (finding Section 10(b) claim valid where "respondent's fraud coincided with the sales themselves").  Accordingly, the court denies Swaminathan's motion to dismiss pursuant to Rule 12(b)(6).

## B.      Rule 9(b)

Rule 9(b), which governs Plaintiffs' Section 10(b) claim, requires that a complaint "state with particularity the circumstances constituting fraud or mistake."  *See Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 768 (N.D. Ill. 2010) (internal citation and quotation omitted); *see also Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (applying Rule 9(b) to claims brought under the Exchange Act).  To meet this requirement, the complaint must specify "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."  *See Sears,* 912 F.3d at 893.  "By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule

requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467 (7th Cir. 1999) (citation omitted).

Swaminathan argues that the complaint fails to allege the who, what, where, and when of the alleged fraud and only makes "conclusory assertions that [Plaintiffs] provided funds and subsequently lost them." (R. 19-1, Def.'s Mem. at 9.) But this grossly mischaracterizes the complaint. Plaintiffs allege with particularity that Swaminathan made statements on specific dates in April, May, and June 2016, via written emails to specific parties. (See, e.g., R. 1, Compl. ¶¶ 12, 16-22, 32, 40); *see, e.g., Hefferman v. Bass,* 467 F.3d 596, 601 (7th Cir. 2006) (finding allegations of an oral statement made at the plaintiff's residence sometime "in late August or early September 2003" sufficient to meet specificity requirements under Rule 9(b)). The complaint even quotes language from the alleged emails and makes sufficiently clear that Swaminathan's statements regarding the supposed purpose and nature of AlphaTigers furthered the alleged fraudulent scheme by inducing Plaintiffs to invest money in the endeavor. (See R. 1, Compl. ¶¶ 16-17, 19); *Sears,* 912 F.3d at 893. To the extent Swaminathan argues that Plaintiffs failed to allege his intent or knowledge with specificity, even under Rule 9(b) a plaintiff may plead a person's scienter generally. *See Hefferman*, 467 F.3d at 601 (finding allegation in complaint that defendant's participation in the fraud "was knowing and intentional" sufficient

under Rule 9(b)). For these reasons, the court finds that Plaintiffs' complaint satisfies Rule 9(b).

## C. Arbitration

Swaminathan next argues that the Operating Agreement subjects this dispute to arbitration. (R. 19-1, Def.'s Mem. at 9-11.) Section 10.11 of the Operating Agreement states that any disputes between the parties must first be referred to "a court certified mediator of the Court in Montgomery County, Maryland," and then to "a neutral arbitrator residing in Montgomery County, Maryland" if the dispute is not resolved in mediation. (R. 28-1, Ex. 1.) The Operating Agreement also provides that "[a]rbitration shall be the exclusive legal remedy of the parties." (Id.) Plaintiffs contend that Swaminathan cannot hold them to the Operating Agreement's arbitration provision because he was not a party to the contract in his individual capacity. (R. 28, Pls.' Resp. at 14-15.) They also argue in their supplemental brief that the Operating Agreement was a product of fraud and should not be enforced. (R. 31, Pls.' Suppl. Resp. at 4-5.)

As an initial matter, whether a binding arbitration agreement exists is usually determined under principles of state contract law. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (citation omitted). However, neither party directly addresses what law applies here. In his supplemental brief Swaminathan notes for the first time that the Operating Agreement stipulates Delaware law applies. (See R. 33, Def.'s Suppl. Mem. at 7, 9; R. 28-1, Ex. 1, § 10.30.) But he only refers to the choice-of-law provision to argue that transferring

venue is in the public interest and does not address how Delaware law governs the enforceability of the Operating Agreement's provisions. Both sides cite primarily to federal law and occasionally to Illinois state decisions in their briefs, but neither side appears to rely on Delaware jurisprudence regarding contract enforceability by a nonparty. In federal question cases such as this one, the Seventh Circuit has advocated applying federal common law principles to choice of law questions. *See Berger v. AXA Network LLC*, 459 F.3d 804, 810 (7th Cir. 2006). However, the Seventh Circuit has also advised that courts not dwell on conflict of laws questions unless the parties make an issue of which state's law applies, which does not appear to be the case here. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991) ("courts are not required to and ordinarily do not create issues where the parties agree"). In fact, Swaminathan does not directly address Plaintiffs' contract-based argument, let alone cite any cases from Delaware or otherwise in rebuttal, despite having the opportunity to file a reply. (See R. 23.) At any rate, Delaware, Illinois, and federal law all treat the question of signatories and contract formation similarly. *See In re Griffin Trading Co.*, 245 B.R. 291, 305 (Bankr. N.D. Ill. 2000) (declining to decide whether state or federal principles control because the applicable state and federal analyses were the same).

Turning to the issue at hand, Plaintiffs contend that there is no agreement to arbitrate between Plaintiffs and Swaminathan because he is not a party to the Operating Agreement in his individual capacity. (See R. 28, Pls.' Resp. at 15.) The court agrees. Swaminathan signed the Operating Agreement on behalf of

OptionTiger Trading, LLC, which was a party to the contract as "a Maryland Limited Liability Company[.]" (See R. 28-1, Ex. 1 at 3, 21.) He also signed on behalf of AlphaTigers, which was a party to the contract as "a Delaware Limited Liability Company." (Id.) Swaminathan is not listed as a party to the Operating Agreement in his individual capacity. (See id.) The general rule is that an arbitration agreement only binds the parties to that agreement. *See Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 857 (7th Cir. 2015) (citations omitted); *see also NAMA Holdings, LLC v. Related World Market Center, LLC*, 922 A.2d 417, 434 (Del. Ch. 2007) ("As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions." (citation omitted)); *Ervin v. Nokia, Inc.,* 812 N.E.2d 534, 539 (Ill. App. Ct. 2004) ("Under either federal or Illinois law, the right to compel arbitration stems from an underlying contract and generally may not be invoked by a nonsignatory to the contract." (internal quotation and citation omitted)). The Seventh Circuit and courts in this district have rejected claims involving contracts brought against individual parties who did not sign the contract at issue in their individual capacities. *See, e.g., Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003) (upholding dismissal of due process claim against individual employees noting that "[t]he individuals, after all, were not even parties to the contract in their individual capacity"); *Rissman v. Rissman*, 229 F.3d 586, 588 (7th Cir. 2000) (finding that a contract clause could not be enforced against one of the defendants who signed the contract exclusively in his capacity as trustee of a trust when he was

sued exclusively in his individual capacity); *Wojcik v. InterArch, Inc.*, No. 13 CV 1332, 2013 WL 5904996, at *10 (N.D. Ill. Nov. 4, 2013) (dismissing breach of contract claims asserted by plaintiffs in their individual capacities since they were not parties to the contract as individuals); *Essex Real Estate Grp., Ltd. v. River Works, L.L.C.*, No. 01 CV 5285, 2002 WL 1822913, at *2-3 (N.D. Ill. Aug. 7, 2002) (dismissing plaintiff as a party to breach of contract claim because he signed the contract at issue in his official capacity as president of a real estate group); *Roberts v. Bd. of Educ.*, 25 F. Supp. 2d 866, 868 (N.D. Ill. 1998) (dismissing breach of contract claim where contract clearly stated it was "by and between" parties which did not include defendants in their individual capacities). Although there are exceptions to this rule, including circumstances such as assumption of the contract, agency, estoppel, and veil-piercing, *see Meinders*, 800 F.3d at 857; *see also NAMA Holdings*, 922 A.2d at 430-31 & n.26, Swaminathan has not asserted that an exception exists here despite bearing the burden to do so, *see Meinders*, 800 F.3d at 857 (citing *Reese v. Forsythe Mergers Grp., Inc.*, 682 N.E.2d 208, 213 (Ill. App. Ct. 1997)); *see also Chapter 7 Tr. Constantino Flores v. Strauss Water, Ltd.*, No. 11141-VCS, 2016 WL 5243950, at *1 (Del. Ch. Sept. 22, 2016) (describing the showing required of a non-party claiming that another is bound to an arbitration clause by estoppel); *Kronenberg v. Katz*, 872 A.2d 568, 605 n.74 (Del. Ch. 2004) ("Of course, a nonparty to a contract ordinarily has no rights under that contract. The exception is when the nonparty can demonstrate that it was a third-party beneficiary of the

contract."). Accordingly, the court finds that Plaintiffs' claim need not be dismissed on the basis of the Operating Agreement's arbitration clause.[2]

## D.    Venue

Swaminathan makes a similar contractual argument regarding venue, relying primarily on Section 10.28 of the Operating Agreement providing that a lawsuit to enforce the agreement "shall be brought in Montgomery County, Maryland." (R. 28-1, Ex. 1.) However, because that provision is not enforceable by Swaminathan in his individual capacity for the same reasons explained above regarding the arbitration clause, the court focuses on Swaminathan's argument that venue is improper because the events giving rise to the claim did not occur in Illinois. (See R. 19-1, Def.'s Mem. at 12-13.) Plaintiffs have the burden of establishing that venue is proper. *Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021, 1027 (N.D. Ill. 2009) (citation omitted). In ruling on a motion to dismiss for improper venue, the court is entitled to consider facts outside of the complaint, takes all the allegations in the complaint as true, and draws all reasonable inferences in favor of Plaintiffs. *Id.*

The venue provision of the Exchange Act, which governs here, *see Atlantic Marine Constr. Co. v. U. S. Dist. Court*, 134 S. Ct. 568, 577 n.2 (2013) ("Section 1391 governs 'venue generally,' that is, in cases where a more specific venue provision does not apply."); *Haskett v. Reliv' Int'l, Inc.*, No. 94 CV 1461, 1994 WL 171431, at

---

[2] Having found that Swaminathan is not entitled to enforce the arbitration clause against Plaintiffs in his individual capacity, the court need not reach Plaintiffs' other argument that the arbitration clause should not be enforced because the Operating Agreement was a product of fraud. (See R. 31, Pls.' Suppl. Resp. at 4-5.)

*2 (N.D. Ill. May 3, 1994) (special venue provision of the Exchange Act supersedes 28 U.S.C. § 1391(b)), provides that a civil action may be brought in any district where: (1) any act or transaction constituting the violation occurred; (2) the defendant is "found"; (3) the defendant is an "inhabitant"; or (4) the defendant transacts any business. *See* 15 U.S.C. § 78aa; *Shapiro v. Santa Fe Gaming Corp.*, No. 97 CV 6117, 1998 WL 102677, at *1 (N.D. Ill. Feb. 27, 1998). Any one of these alternatives support proper venue, *see Tomkins v. Forte Capital Partners*, No. 05 CV 5251, 2006 WL 907776, at *3 (N.D. Ill. April 5, 2006) (citation omitted), and the standard for establishing venue under this provision is not a rigorous one, *see Haskett*, 1994 WL 171431, at *2 (citation omitted).

The complaint alleges that Swaminathan sold his online course to Plaintiff Victor Santore, a resident of the NDIL, and solicited him to join AlphaTigers. (See R. 1, Compl. ¶¶ 3, 11-12.) Swaminathan also collected funds from and corresponded with Santore, acts which form the basis of Plaintiffs' claim. (See, e.g., id. ¶¶ 5, 15, 16-22, 32, 38-55.) Courts have held that telephone calls, emails, and similar long-distance contacts directed to a forum can be sufficient acts or transactions to establish venue under the Exchange Act. *See, e.g., Poling v. Farrah*, 131 F. Supp. 2d 191, 193-94 (D.D.C. 2001) (collecting cases); *see also United States v. Russell*, No. 1:10-cr-00968, 2014 WL 2558761, at *10 (E.D.N.Y. June 5, 2014) (finding venue proper in the chosen forum where the defendants' "schemes relied heavily on the use of the internet for targeting victims as well as executing the schemes, which were far-reaching and targeted victims throughout the country"); *Cortis, Inc. v.*

*CortiSlim Int'l, Inc.*, No. 3:12-CV-00562-P, 2012 WL 12885719, at *3 (N.D. Tex. Oct. 16, 2012) (finding that an "act or transaction constituting the violation" occurred in the forum because calls were directed into the forum, documents were emailed to a forum resident, and payments originated from the forum "that culminated in a deal allegedly tainted with federal securities violations").  The court therefore concludes that venue is proper here in the NDIL under the Exchange Act.

However, even though venue is proper in this district, the court may still transfer venue "for the convenience of the parties and witnesses [and] in the interest of justice."  *See* 28 U.S.C. § 1404(a); *see also Roberts & Schaefer Co. v. Merit Contracting, Inc.*, 99 F.3d 248, 254 (7th Cir. 1996).  District courts have broad discretion in interpreting and weighing these factors, which act more as guidelines than as rigid rules and should be applied on a case-by-case basis.  *See Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986).  Swaminathan ultimately bears the burden of persuasion when it comes to transferring venue.  *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989).

Because Plaintiffs do not appear to dispute that this suit could have been brought in the District of Maryland, *see* 28 U.S.C. § 1404(a) (stating that transfer can only be made to a district in which the action "might have been brought"), the court begins its analysis by considering convenience.  When weighing convenience, the court looks to factors such as: (1) Plaintiffs' initial choice of forum; (2) the site of material events; (3) the relative ease of access to sources of proof; (4) the convenience to the witnesses to be called to testify in the case; and (5) the

convenience to the parties themselves. *See Plotkin v. IP Axess, Inc.*, 168 F. Supp. 2d 899, 902 (N.D. Ill. 2001). Plaintiffs' choice of forum is given substantial weight, especially where a plaintiff is a resident of the judicial district in which the suit is brought, as is the case here. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). However, where the plaintiff's choice of forum has a weak connection with the operative facts underlying the claim, the deference given that selection is reduced. *See Tomkins*, 2006 WL 907776, at *5 (citations omitted). While Santore resides in the NDIL, the other Plaintiffs live in states on the East Coast and in California.[3] (See R. 1, Compl. ¶ 3.) Furthermore, Swaminathan persuasively points out that the site of material events favors transfer because the correspondence at issue originated in Maryland, the financial accounts were opened there, and the disputed trades were also executed there. (See R. 19-1, Def.'s Mem. at 12-13; R. 33, Def.'s Suppl. Mem. at 9-10.) For these reasons, deference to Plaintiffs' choice of forum must be reduced.

As for ease of access to evidence and witnesses' convenience, aside from making general statements about Maryland being the site of material events, Swaminathan makes no real effort to explain how the location of business records, non-party witnesses, or any additional sources of proof favors transfer. Meanwhile, Plaintiffs persuasively contend that records of Swaminathan's trading activity and the emails containing allegedly fraudulent statements can be obtained in digital

---

[3] Swaminathan incorrectly asserts that some parties to this action reside in Canada and Israel. (R. 33, Def.'s Suppl. Mem. at 9.) While two of the Partners identified in the Operating Agreement do have addresses there, those individuals are not plaintiffs in this case. (Compare R. 28-1, Ex. A, with R. 1, Compl. ¶ 3.)

format, which reduces the importance of the "ease of access to sources" factor. (See R. 31, Pls.' Suppl. Mem. at 9.) Because it is Swaminathan's burden to persuade the court why it should transfer venue, and because he does little to further his argument when it comes to access to sources and witnesses' convenience, this factor weighs against transfer.

Regarding the convenience of the parties, this factor also weighs slightly against transfer. Even though five of the eight Plaintiffs live much closer to Maryland than Illinois and Swaminathan lives in or near Maryland, (see R. 1, Compl. ¶¶ 3, 6; R. 31-1, Ex. 2), the NDIL is a relatively central location, (see R. 31, Pls.' Suppl. Mem. at 10). Plaintiffs also urge the court to consider that their counsel is located in the NDIL. (See R. 31, Pls.' Suppl. Mem. at 6.) Courts in this district have not traditionally given significant weight to the location of counsel. *See, e.g., Humphries v. Coppercrest Leveraged Mort. Fund*, No. 10 CV 7756, 2012 WL 527528, at *3-5 (N.D. Ill. Feb. 15, 2012) (collecting cases); *see also* Wright, Miller, & Cooper, 15 Fed. Prac. & Proc. Juris. 3d § 3850 (explaining that "the great majority of the cases" have concluded that convenience and location of counsel "is not to be considered at all, that it is 'irrelevant' or 'improper' to consider, or that it is to be given very little weight by the district court" in considering whether to transfer a case). However, courts have considered "the financial burdens on the litigants and their interest in using their established counsel, which courts are more likely to regard as significant[.]" Wright et al., *supra*, § 3850. Here, Plaintiffs state that they were unable to find representation in Maryland and ultimately retained the

Northwestern Pritzker School of Law Bluhm Legal Clinic, which they assert has a limited amount of resources. (See R. 31, Pls.' Suppl. Resp. at 6, 10.) Plaintiffs further argue that "requiring the Clinic attorneys to travel to Maryland would be an unnecessary financial burden[,]" although they do not specify who would bear the costs of such travel. (Id. at 10.) At any rate, it is reasonable to conclude that the location of Plaintiffs' counsel in this case bears the cost of litigation, adding slight weight in favor of Plaintiffs' choice of forum.

Lastly, the court must also consider which venue best serves "the interest of justice." *Coffey*, 796 F.2d at 220. In weighing this factor, the court takes into account considerations such as: "(1) the speed at which a case will proceed to trial, (2) the court's familiarity with the applicable law, (3) the relation of the community to the occurrence at issue, and (4) the desirability of resolving controversies in their locale." *Plotkin*, 168 F. Supp. 2d at 904 (citation omitted). Even where the convenience of the parties and witnesses may call for a different result, the "interest of justice" component can be determinative. *See Coffey*, 796 F.2d at 220.

The court finds that the speed that the case might go to trial slightly favors transfer. For the 12-month period ending September 30, 2017, the median time from filing to disposition for civil cases was the same in the NDIL and in the District of Maryland. *See* Admin. Office of the U.S. Courts, FEDERAL COURT MANAGEMENT STATISTICS (2017), *available at* http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.201 7.pdf (8.5 months in both forums). But the median time from filing to trial for civil

cases was 36.8 months in the NDIL and 30.3 in the District of Maryland. *Id.* The second factor, the court's familiarity with applicable law, is neutral because Plaintiffs' claim is brought under the Exchange Act and both forums are equally capable of applying securities regulations. *See Tomkins*, 2006 WL 907776, at *7. The third and fourth factors are neutral because Illinois has an interest in protecting its citizens from fraud, while Maryland has an interest in ensuring that those who conduct business in the state receive a fair trial. *See Einhaus v. Textmunication Holdings, Inc.*, No. 17 CV 4478, 2018 WL 398258, at *4 (N.D. Ill. Jan. 12, 2018) (finding factors neutral under similar circumstances); *Tomkins*, 2006 WL 907776, at *7 (same).

In light of all these factors, the question of whether transfer is appropriate is a close one. The court is cognizant of the fact that given the alleged fraud's online medium and the nature of its distribution, applying traditional venue considerations here is far from straightforward. However, the court denies Swaminathan's request to transfer the case to the District of Maryland for two main reasons. First, even though the significance of Plaintiffs' choice of forum is lessened to some extent because the site of material events occurred in or originated from Maryland, Plaintiffs' choice of venue is still entitled to some deference. While only one of the Plaintiffs lives in the NDIL, the other non-Illinois resident Plaintiffs *chose* to bring their suit in this forum. Second, Swaminathan ultimately bore the burden of showing that the "transferee forum is clearly more convenient" than the transferor forum. *See Heller,* 883 F.2d at 1293 (quotation marks and citation

omitted). And although he did highlight certain relevant factors in favor of transfer, he failed to fully engage other factors under Section 1404(a), choosing instead to rely primarily on the forum-selection clause in the Operating Agreement which the court finds unenforceable as to Swaminathan in his individual capacity. Accordingly, the court finds that Swaminathan did not meet his burden of persuasion.

## Conclusion

For the foregoing reasons, Swaminathan's motion to dismiss, or in the alternative, to transfer, is denied.

ENTER:

Young B. Kim
United States Magistrate Judge